Roland E. Houle[1] *vs.* Richard H. Low & others.[2]

Norfolk. February 6, 1990. - July 5, 1990.

Present: Liacos, C.J., Wilkins, Abrams, Nolan, Lynch, O'Connor & Greaney, JJ.

*Limitations, Statute of. Fiduciary. Corporation,* Stockholder, Derivative action, Special litigation committee. *Practice, Civil,* Summary judgment.

In a civil action, summary judgment was properly entered for the individual defendants where the plaintiff's cause of action based on tort claims was not commenced within the three-year limitation period specified in G. L. c. 260, § 2A. [812-813]

Review of the law in other jurisdictions and of legal commentary with respect to the permissibility of a corporation's use of a "special litigation committee," appointed by a majority of the board of directors, for the purpose of determining the propriety of pursuing a derivative action in behalf of the corporation. [814-820]

A corporate board of directors named as defendants in a derivative action may create a "special litigation committee" and delegate to it the determination whether the derivative action should be pursued in behalf of the corporation, subject to judicial scrutiny of the committee's independence, lack of bias, and good faith. [820-822]

In a derivative action in behalf of a corporation, summary judgment for the defendant corporation was not appropriate where the record did not demonstrate there was no genuine issue of material fact with respect to the independence and lack of bias of a director and stockholder of the corporation who was the single-member "special litigation committee" that determined the derivative action should not be pursued in behalf of the corporation. [822-824]

Statement of the standard of judicial review of a decision of an independent, unbiased "special litigation committee," acting in good faith, appointed by a corporation's board of directors for the purpose of deter-

---

[1]Individually and as a shareholder of Eye Health Services, Inc.

[2]John M. Carroll, Eric H. Johnson, Robert T. Lacy, Brent W. Lambert, individually and as directors of Eye Health Services, Inc., and New England Eye Surgical Center, Inc.; Eye Health Services, Inc., New England Eye Surgical Center, Inc.; and Eye Health Services - Optical Products, Inc.

mining the propriety of pursuing a derivative action in behalf of the corporation. [824]


CIVIL ACTION commenced in the Superior Court Department on January 15, 1988.

Motions for partial summary judgment, summary judgment, and involuntary dismissal were heard by *James P. Lynch, Jr.*, J., and a final judgment was entered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Howard B. Cloth* for the plaintiff.

*Robert S. Frank, Jr.* (*Edward H. Seksay* with him) for Brent W. Lambert & others.

*William F. Lee* (*Veronica Serrato* with him) for Eye Health Services, Inc.

NOLAN, J. The plaintiff is an ophthalmologist who formed a corporation, the defendant, Eye Health Services, Inc. (Eye Health), with the individual defendants in 1971. He joins as defendants two affiliated corporations, New England Eye Surgical Center, Inc. (Surgical Center), and Eye Health Services - Optical Products, Inc. (Optical Products). The plaintiff sued individually and derivatively as a minority shareholder, charging fraud, breach of fiduciary duty, and misappropriation of corporate opportunities. Eye Health filed a motion for summary judgment which was allowed as to the plaintiff's derivative action. The motion for summary judgment of Optical Products was denied because of the genuine issue of material fact as to its formation. Motions for summary judgment filed by the individual defendants and Surgical Center were allowed. The plaintiff filed a motion for voluntary dismissal under Mass. R. Civ. P. 41 (a) (2), 365 Mass. 803 (1974), as to Optical Products which he concedes had not been formed. Ultimately, final judgment was entered for all defendants as to all claims of the plaintiff. From these judgments the plaintiff appealed. We transferred the case to this court on our own motion. We affirm in part and reverse in part.

The plaintiff and individual defendants had been practicing ophthalmology under the corporate umbrella as shareholders and directors of Eye Health since 1971. The plaintiff and individual defendants in 1983 began discussing at length the possibility of forming a surgical center designed as a hospital facility to provide outpatient operating services to patients with eye disorders. Toward this goal, the plaintiff visited an outpatient surgical facility in North Carolina and submitted a written report to his fellow shareholders and directors, the defendants.

In early February, 1984, the individual defendants met in Florida without the plaintiff to investigate the merits of opening a surgical center. They decided to launch the surgical center as a venture separate from Eye Health but to locate it in the offices of Eye Health in Weymouth. They voted unanimously not to invite the plaintiff to participate and one of their members informed him of this vote on February 6 or 7, 1984. The opportunity to participate in the new venture was not extended to Eye Health. On January 18, 1985, Surgical Center was incorporated in Massachusetts by the individual defendants for the purpose of operating the surgical eye venture. The plaintiff commenced an action against the individual defendants and against Eye Health and Surgical Center on January 15, 1988.

A motion for summary judgment shall be allowed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974).

1. *Claims against individual defendants.* The defendants rely on the bar of the statute of limitations. The plaintiff's claims are governed by G. L. c. 260, § 2A (1988 ed.), which contains a three-year limitation. *Woodcock* v. *American Investment Co.,* 376 Mass. 169, 173-174 (1978). The plaintiff's cause of action accrued on February 6 or 7, 1984, when he was informed of the vote not to invite him to participate. His action, then, should have been commenced on or before Feb-

ruary 6 or 7, 1987. In fact, it was not commenced until January 15, 1988. The facts which support the plaintiff's allegation of wrongdoing were not inherently unknowable (see *Hendrickson* v. *Sears*, 365 Mass. 83, 88-91 [1974]), nor is there even a contention of fraudulent concealment. The plaintiff's claim of corporate "freeze out" is a tort claim, but it is not a continuing tort which would save the day for the plaintiff in showing that he had seasonably commenced his action. See *Kirley* v. *Kirley*, 25 Mass. App. Ct. 651, 654-655 (1988). The defendants' alleged breach of fiduciary duty occurred when they voted not to invite him to participate and gave him notice of such rejection. The cause of action for this breach of fiduciary duty arose, if at all, at that time (February 6 or 7, 1984). See *Akin* v. *Warner*, 318 Mass. 669, 676 (1945). Accordingly, the judgments entered in behalf of the individual defendants are affirmed.

2. *Claims against Eye Health.* The plaintiff as a stockholder and director of Eye Health has brought a derivative stockholder's action in behalf of Eye Health, alleging violations of the defendants' fiduciary obligations to Eye Health and demanding damages in behalf of Eye Health.[3]

Responding to this derivative action, the directors of Eye Health appointed Dr. Shelley G. McKee, to serve as "a special litigation committee" to recommend a course of conduct for Eye Health as to the derivative action. McKee is a director and shareholder of Eye Health but is not a defendant in this action.

McKee retained an experienced attorney to investigate the derivative claim, and to recommend whether Eye Health should pursue the claims. The attorney's report concluded that pursuit of the derivative claims would not be in the best interests of Eye Health. On the strength of this report, McKee recommended to the board of directors of Eye Health

---

[3]In his complaint, the plaintiff averred that it would be futile to make a demand to institute suit on the directors or the shareholders of Eye Health since a majority of the directors and the shareholders are defendants. This is, therefore, a demand excused case. See Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974); *Datz* v. *Keller*, 347 Mass. 766 (1964).

that no action be taken on the plaintiff's derivative claims. The directors unanimously accepted McKee's recommendation and voted to seek dismissal of the derivative claims by the filing of a motion for summary judgment.

The motion judge examined the record "to determine whether a genuine issue of material fact exists as to the committee's independence, good faith and procedural fairness." The judge ruled that there was no such genuine issue. He declined "to invade the domain of Dr. McKee's independent business judgment," and allowed Eye Health's motion for summary judgment.

The issues in this case are (1) whether Massachusetts law permits the use of a special litigation committee, appointed by a majority of directors, to determine the propriety of pursuing a derivative action, and (2) if so, what degree of judicial scrutiny should be applied to that committee's decison? Before turning to Massachusetts law, we deem a brief review of the law in other jurisdictions to be necessary.

The majority of courts facing the special litigation committee issue have determined that the use of such committees is permissible. See, e.g., *Zapata Corp.* v. *Maldonado*, 430 A.2d 779 (Del. 1981); *Auerbach* v. *Bennett*, 47 N.Y.2d 619 (1979); *Alford* v. *Shaw*, 320 N.C. 465 (1987). See Annot., Propriety of Termination of Properly Initiated Derivative Action by "Independent Committee" Appointed By Board of Directors Whose Actions (or Inaction) Are Under Attack, 22 A.L.R. 4th 1206 (1983). While these jurisdictions differ on the proper degree of judicial oversight, they agree that the propriety of accepting a special litigation committee decision can be determined on a case-by-case basis.

Other courts have held that the special litigation committee device cannot be used. In *Miller* v. *Register & Tribune Syndicate, Inc.*, 336 N.W.2d 709, 715-718 (Iowa 1983), the Supreme Court of Iowa was concerned with the anomalous situation where a majority of the directors, because they were named as defendants, could not terminate a derivative action, yet could appoint a committee of their choosing which would have that power. The court reasoned that "the

potential for structural bias on the part of a litigation committee appointed by directors who are parties to derivative actions is sufficiently great and sufficiently difficult of precise proof in an individual case." *Id.* at 718. Accordingly, the court adopted a prophylactic rule, prohibiting the use of special litigation committees, at least in cases where a majority of directors are named as the defendants in a derivative suit. *Id.*[4] The Court of Appeals of North Carolina reached the same conclusion in *Alford* v. *Shaw*, 72 N.C. App. 537 (1985), aff'd after modification, 320 N.C. 465 (1987).[5] The court cited the danger of "structural bias" and North Carolina's policy favoring derivative litigation. *Id.* at 547. The per se rule of *Miller*, preventing the appointment of special litigation committees by a majority of interested directors, would best serve North Carolina, the court reasoned. *Alford* v. *Shaw, supra.*

The concern expressed by the *Miller* court and by the lower court in *Alford* with the "structural bias" of special litigation committees is not unfounded. A number of commentators have recognized the possibility of inherent bias when "independent" directors pass judgment on other directors. In Cox & Munsinger, Bias in the Boardroom: Psychological Foundations and Legal Implications of Corporate Cohesion, 48 Law & Contemp. Probs. 83, 84-85 (No. 3, 1985), the authors "examine[d] several social-psychological mechanisms that can generate bias in the directors' assessment of the suit, including biases established by appointment of

---

[4] The *Miller* court did conclude that a corporation can apply to a court of equity for the appointment of an independent "special panel" which could decide whether the corporation should pursue the derivative claim. *Miller* v. *Register & Tribune Syndicate, Inc.*, 336 N.W.2d 709, 718 (Iowa 1983).

[5] The Supreme Court of North Carolina originally reversed the court of appeals. *Alford* v. *Shaw*, 318 N.C. 289 (1986). The court then withdrew its opinion and issued a new opinion, affirming the court of appeals. *Alford* v. *Shaw*, 320 N.C. 465 (1987). It is important to note, however, that the State Supreme Court rejected the court of appeals' adoption of *Miller, supra*, and instead adopted the reasoning of *Zapata Corp.* v. *Maldonado*, 430 A.2d 779 (Del. 1981), discussed *infra*.

members to the board or a special litigation committee, control of pecuniary or nonpecuniary rewards made available to the independent directors by the defendant members of the board of directors, the independent directors' prior associations with the defendants, and their common cultural and social heritages." *Id.* at 84-85. They concluded that, "in combination, these several psychological mechanisms can be expected to generate subtle, but powerful, biases which result in the independent directors' reaching a decision insulating colleagues on the board from legal sanctions." *Id.* at 85. In another article, the following contention appears: "[A] derivative action invokes a response of group loyalty, so that even a 'maverick' director may feel compelled to close ranks and protect his fellows from the attack of the 'strike suiter.' . . . [A] refusal to protect one's peers once events have transpired is seen as disloyal treachery." Coffee & Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform, 81 Colum. L. Rev. 261, 283 (1981). As the Supreme Court of Delaware has noted, even in the case of an independent director, "[t]he question naturally arises whether a 'there but for the grace of God go I' empathy might not play a role." *Zapata Corp.* v. *Maldonado*, 430 A.2d 779, 787 (Del. 1981).

Those jurisdictions which permit the use of the special litigation committee device disagree on the degree of judicial oversight necessary to ensure that such committees reach fair and principled decisions. One approach to the problem, and the one adopted by the motion judge, is exemplified in *Auerbach* v. *Bennett*, 47 N.Y. 2d 619 (1979). In *Auerbach*, the trial court dismissed a derivative action based on the decision of a special litigation committee that the corporation should not pursue the case. The New York Court of Appeals upheld the dismissal. The court reasoned that derivative claims against corporate directors belong to the corporation itself and that "the decision whether and to what extent to explore and prosecute such claims lies within the judgment and control of the corporation's board of directors." *Id.* at 631. In other words, the decision whether to continue the de-

rivative suit is a matter of business judgment and whatever decision the committee might make, the courts should not interfere. The New York court cautioned, however, that the shield of the business judgment rule would not prevent courts from inquiring into the adequacy of the investigation made by the special litigation committee and the independence of the board members chosen for the committee. *Id.* at 631-634.

A number of other courts, relying on the business judgment rule, have followed what we shall refer to as the *Auerbach* approach. See *Gaines* v. *Haughton*, 645 F.2d 761, 770-772 (9th Cir. 1981) (applying California law and adopting *Auerbach* approach), cert. denied, 454 U.S. 1145 (1982); *Genzer* v. *Cunningham*, 498 F. Supp. 682, 686-689 (E.D. Mich. 1980) (applying Michigan law); *Roberts* v. *Alabama Power Co.*, 404 So. 2d 629 (Ala. 1981) (adopting same approach as *Auerbach* court); *Will* v. *Engebretson & Co.*, 213 Cal. App. 3d 1033 (1989) (although not deciding whether to follow *Auerbach*, court reversed summary judgment where there was factual dispute as to adequacy of committee investigation); *Black* v. *NuAire, Inc.*, 426 N.W.2d 203 (Minn. Ct. App. 1988) (expressly following *Auerbach*). See also Duesenberg, The Business Judgment Rule and Shareholder Derivative Suits: A View from the Inside, 60 Wash. U.L.Q. 311, 320 (1982) (arguing in favor of *Auerbach*). The *Auerbach* approach is subject to the criticism that it does not realistically deal with the danger of structural bias in the special litigation committee device. See Elfin, An Evaluation of a New Trend in Corporate Law: Dismissal Of Derivative Suits by Minority Board Committees, 20 Am. Bus. L.J. 179, 195 (1982) (criticizing *Auerbach* approach as "inherently defective"). It places "the corporate fox in charge of the shareholders' hen house." *Alford* v. *Shaw*, 318 N.C. 289, 318 (1986) (Martin, J., dissenting from majority adoption of *Auerbach* approach), withdrawn, 320 N.C. 465 (1987) (adopting *Zapata* approach).

A very different approach to the special litigation committee question is represented by *Zapata Corp.* v. *Maldonado*, 430 A.2d 779 (Del. 1981). In *Zapata*, the Supreme Court of

Delaware held, as had the *Auerbach* court, that a reviewing court must scrutinize the independence, good faith, and procedures used by a special litigation committee. *Id.* at 788. The Delaware court was not satisfied that such a limited review would be sufficient, however. The court was concerned with the "risks" inherent in the "realities of a situation" where directors are asked to decide whether the corporation should sue fellow directors. *Id.* Cognizant of the ever-present danger of structural bias, the *Zapata* court enunciated a second step to the analysis, in which the court would apply "its own independent business judgment." *Id.* This second step "is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." *Id.* at 789.

The *Zapata* approach involves both a procedural and a substantive review of the committee decision, as opposed to *Auerbach's* purely procedural review. A number of courts have adopted the *Zapata* approach in an attempt to balance the contending interests involved in cases of this sort. See *In re Gen. Tire & Rubber Co. Sec. Litigation*, 726 F.2d 1075, 1083 (6th Cir.) (applying Ohio law and affirming Federal District Court's application of *Zapata*), cert. denied, 469 U.S. 858 (1984); *Joy* v. *North*, 692 F.2d 880 (2d Cir. 1982) (applying Connecticut law), cert. denied sub nom. *City Trust* v. *Joy*, 460 U.S. 1051 (1983); *Peller* v. *Southern Co.*, 707 F. Supp. 525, 527 (N.D. Ga. 1988) (applying *Zapata* approach under Georgia law); *Holmstrom* v. *Coastal Indus.*, 645 F. Supp. 963, 987-988 (N.D. Ohio 1984) (applying Ohio law); *Rosengarten* v. *Buckley*, 613 F. Supp. 1493 (D. Md. 1985) (applying Maryland law); *Abella* v. *Universal Leaf Tobacco Co.*, 546 F. Supp. 795, 799-800 (E.D. Va. 1982) (applying Virginia law); *Alford* v. *Shaw*, 320 N.C. 465 (1987).

The objection to *Zapata* is that its second step thrusts the court into the position of making business judgments. Note, *Zapata Corp.* v. *Maldonado*: Delaware's Judicial Business

Judgment Rule — A Ship Without a Rudder? 19 Cal. W.L. Rev. 189, 209-210 (1982) (criticizing ability of courts to make business judgments as required by *Zapata*). The judiciary may be ill equipped to consider all the factors which bear on whether pursuing a derivative suit is in the best interest of the corporation. Moreover, the *Zapata* approach adds another layer of dispute, sidetracking the derivative case itself. See *Kaplan* v. *Wyatt*, 484 A.2d 501, 509-512 (Del. Ch. 1984) (discussing procedural morass created by second step of *Zapata* test), aff'd, 499 A.2d 1184 (Del. 1985).

The American Law Institute (ALI), as part of an ongoing project, has also ventured into the debate over the use of special litigation committees. The ALI formulation expressly recognizes that, once a derivative suit is properly instituted, the board of directors can delegate its authority to a committee of independent, disinterested directors. ALI Principles of Corporate Governance § 7.06 (Tent. Draft No. 8, 1988). If the committee seeks dismissal of the derivative suit, the trial judge's first task is to evaluate the independence of the committee members and the procedures utilized by the committee in reaching its decision. ALI Principles of Corporate Governance § 7.10 (Tent. Draft No. 9, 1989). Section 7.10 requires that the committee's decision be based on an "adequately informed" evaluation, that the committee have two or more director members, that no members are interested in the challenged transaction, that the committee be capable of objective judgment, that the committee be assisted by counsel, and that the committee submit a written report to the judge. *Id.* If the judge is satisfied that the committee has complied with the requirements of § 7.10, he or she then must proceed to a second-level inquiry. See ALI Principles of Corporate Governance § 7.08 (Tent. Draft No. 8, 1988). The judge must determine whether the committee reasonably concluded that dismissal was in the best interests of the corporation. In making a determination, the judge must look at the likelihood of a judgment in the plaintiff's favor, the expected recovery as compared to the out-of-pocket costs,

whether the corporation itself took corrective action, and whether the balance of corporate interests warrants dismissal. *Id.* Dismissal is not appropriate when it would permit any defendant, who has control of the corporation, to retain a significant improper benefit. *Id.* This emerging ALI approach draws upon *Zapata* for its two-step inquiry, but seeks to incorporate fair, workable standards into both steps of the test.

We turn now to a consideration of Massachusetts law to determine whether special litigation committees are permissible and, if so, what degree of judicial scrutiny is applicable to their decisions.

We begin with recognition of the principle that corporations have the power to sue, G. L. c. 156B, § 9 (*b*) (1988 ed.), and that the power to decide whether the corporation *should* sue is vested in either the board of directors or the stockholders. G. L. c. 156B, § 54 (1988 ed.). *S. Solomont & Sons Trust* v. *New England Theatres Operating Corp.*, 326 Mass. 99, 112-115 (1950). Moreover, G. L. c. 156B, § 55 (1988 ed.), makes it clear that the board of directors may create a committee and delegate to it certain powers, including the power to bring suit. Thus, as a matter of raw corporate power, the formation of a special litigation committee is clearly permissible. However, the problem is whether the majority of directors, who are clearly interested in whether the corporation pursues the action, are disqualified from participating at all. See *American Discount Corp.* v. *Kaitz*, 348 Mass. 706, 711 (1965). It is beyond dispute that the interested directors could not themselves vote to dismiss the derivative claim.[6] *Id.* Whether those directors may create a committee which will have that power is a different question, however, and one that we think requires an affirmative answer. Once a special litigation committee is formed, the decision whether to dismiss is removed from the sphere of the interested directors' control. It is sufficiently removed that

---

[6] We ignore as ineffective the directors' vote to adopt McKee's recommendation. The only corporate action with legal significance is McKee's recommendation itself.

the board is not disqualified from choosing the committee. The real danger of taint lies in whether the particular committee chosen is independent and unbiased. Accordingly, judicial scrutiny of the committee's independence, in each case, should purge the danger of taint. There is no need to create a blanket rule prohibiting the use of a special litigation committee in every case where a majority of a board of directors are named as defendants.

Special litigation committees serve a valuable and useful role. Our cases have long recognized that the question whether a corporation should pursue a given lawsuit involves factors other than the merits of the claim. It is often a question of business policy. "Intelligent and honest men differ upon questions of business policy. It is not always best to insist on one's rights . . . ." *S. Solomont & Sons Trust, supra* at 112, quoting *Dunphy* v. *Traveller Newspaper Ass'n*, 146 Mass. 495, 497 (1888). Indeed, the requirement that a stockholder wishing to bring suit make a demand on the directors and the other stockholders evolved within the equitable jurisprudence of the derivative action in large measure as a recognition of the fact that the decision whether to sue is properly left to the corporate authorities. See *Brewer* v. *Properties of the Boston Theatre*, 104 Mass. 378, 387 (1870). The fact that the procedural requirement of demand is excused in a given case (as it was here) does not extinguish the substantive principle that the decision as to what is in the corporation's best interest is a matter of business judgment. An independent and unbiased committee can weigh and balance the divers factors in a given case and make a business judgment as to the proper course of action.

Thus, we join the majority of courts which hold that the special litigation committee device is permissible. Such a committee can have the ability and expertise to decide whether a given derivative suit is in the corporation's best interest. We turn now to the determination of what standard of judicial review is applicable to decisions of special litigation committees.

The value of a special litigation committee is coextensive with the extent to which that committee truly exercises business judgment. In order to ensure that special litigation committees do act for the corporation's best interest, a good deal of judicial oversight is necessary in each case. At the same time, however, courts must be careful not to usurp the committee's valuable role in exercising business judgment. At a minimum, a special litigation committee must be independent, unbiased, and act in good faith. Moreover, such a committee must conduct a thorough and careful analysis regarding the plaintiff's derivative suit. Accord *Auerbach* v. *Bennett*, 47 N.Y.2d 619, 634-636 (1979); *Zapata Corp.* v. *Maldonado*, 430 A.2d 779, 788-789 (Del. 1981). Cf. *Hasan* v. *CleveTrust Realty Investors*, 729 F.2d 372, 375 (6th Cir. 1984) (applying Massachusetts law). The burden of proving that these procedural requirements have been met must rest, in all fairness, on the party capable of making that proof — the corporation.[7]

The motion judge below determined that there was no genuine issue as to the Eye Health committee's independence, good faith, and procedural fairness.[8] Dr. McKee, the sole committee member, is not a defendant and there has been no allegation that she participated in any of the alleged wrong-

---

[7]In any event, this type of case will almost always arise in the context of a motion for summary judgment. The burden of showing that there is no factual dispute as to the material issues rests on the moving party — the corporation. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989), and cases cited.

[8]The jurisprudence is meager on the appropriate factors for consideration on the issue of procedural fairness. In *Hasan, supra*, where the corporation failed to demonstrate procedural fairness, the court pointed with approval to the activities of the committee in *Auerbach*, which "promptly engaged eminent special counsel for guidance, examined the prior work of a special audit committee, interviewed representatives of . . . and reviewed testimony before the SEC. Perhaps most important, the court found that the committee conducted personal interviews with individuals who had 'participated in any way in the questioned payments.' 419 N.Y.S.2d at 930." However, *Auerbach* provides that the "selection of appropriate investigative methods must always turn on the nature and characteristics of the particular subject being investigated." *Auerbach, supra* at 636.

doing. She has no interest in the surgical center (the purported corporate opportunity taken by defendants). There is no evidence that Dr. McKee or the committee's counsel acted with less than good faith.

In opposition to Eye Health's motion for summary judgment, Dr. Houle points to Dr. McKee's junior role in relation to the defendants as the youngest of the participating physicians and stockholders. He points to the closeness of her professional association with them, her business connections with them, and her dependency on them for future economic success. He argues that these circumstances alone warrant a factual investigation into her independence and good faith.

Although typically there are relationships among directors that call for scrutiny of the independence of members of a litigation committee, Dr. McKee's position is particularly suspect. She is not an independent, outside director. Her professional advancement appears to be dependent on the individual defendants. She is acting as a committee of one. As we shall explain shortly, that fact alone does not disqualify her from serving as the litigation committee. It is, however, a factor to be weighed in deciding whether the committee was independent and unbiased. The pressures on Dr. McKee to recommend dismissal of the action may have been strong. The possible consequences to her of a contrary recommendation call for further consideration of her independence. We cannot fairly say that, on this record, there is no dispute of material fact as to whether the committee was independent and unbiased.

We briefly note one factor not discussed by the motion judge in his memorandum. The committee in this case consisted of only one director.[9] We decline to adopt a per se rule that special litigation committees should have more than one director, but we think the number of committee members should be a factor in determining the committee's ability to

---

[9] We express no opinion as to the propriety of appointing shareholders to a litigation committee when, as here, there may be no disinterested directors.

act independently. "If a single member committee is to be used, the member should, like Caesar's wife, be above reproach." *Lewis* v. *Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985). See *Hasan* v. *CleveTrust Realty Investors, supra* at 378-380 (reversing summary judgment where sole committee member had other connections with defendants showing possible bias). Contrast ALI Principles of Corporate Governance § 7.10 (Tent. Draft No. 9, 1989) (requiring two or more members).

Because we cannot say that there is no genuine issue as to the committee's bias, we reverse the summary judgment for the corporate defendant, and we remand the case for an evidentiary hearing before a judge without a jury to determine whether the committee (McKee) was independent and unbiased. If the corporate defendant fails to sustain its burden of proof in that regard, the case should proceed to trial.

Suppose, however, that the corporate defendant satisfies the judge that the committee was independent. Such an eventuality would raise a second question, the one on which the *Zapata* and *Auerbach* courts parted ways. As noted, Massachusetts has always recognized the need for courts to abstain from interfering in business judgments. *S. Solomont & Sons Trust, supra.* At the same time, this court has always "vigorously scrutinize[d] the situation" where a director's loyalty to the corporation is in conflict with his or her own self-interest. *American Discount Corp.* v. *Kaitz*, 348 Mass. 706, 711 (1965). Both concerns are present in this case, as is the danger of "structural bias" recognized by so many courts and commentators. The balancing of these various concerns requires reviewing judges to go beyond establishing the committee's independence, good faith and the adequacy of its investigation.

The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision. Even in those cases where a committee is independent and conducts a thorough investigation, the judge may conclude that the committee's decision is contrary to the

great weight of evidence.[10] In conducting its review, the court should look to factors such as those identified by ALI, which include the likelihood of a judgment in the plaintiff's favor, the expected recovery as compared to out-of-pocket costs, whether the corporation itself took corrective action, whether the balance of corporate interests warrants dismissal, and whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit. See ALI Principles of Corporate Governance § 7.08 (Tent. Draft No. 8, 1988).

This inquiry will allow the special litigation committee to point out to the judge on what factors it relied and why those factors support its decision. The test will also allow the derivative plaintiff to point out factors not considered by the committee or why those relied upon by the committee do not support its conclusion. Such a limited review by the judge will avoid the problem in the second level of the *Zapata* test, which requires the judge to exercise his or her own business judgment. The courts are better able to determine the merits of a law suit than whether a decision is correct based on a subjective evaluation of the business policies involved.[11]

The judgments in favor of the individual defendants are affirmed. The judgment for the corporation in the derivative action is reversed and the case is remanded for further pro-

---

[10]The "evidence" referred to will often constitute policy factors which bear on the propriety, in a business sense, of pursuing the derivative suit. The judge should weigh such considerations along with all others to determine whether they fairly support the committee's ultimate decision.

[11]The parties have touched on the fact that Eye Health is a "close corporation" as defined in *Donahue* v. *Rodd Electrotype Co. of New England*, 367 Mass. 578, 585-597 (1975). The distinction between close corporations and public corporations does not require a different standard of review. We note that the statute allowing a board of directors to appoint a committee draws no distinction between close corporations and public corporations. G. L. c. 156B, § 55. The factors which contribute to making a corporation a close corporation may, however, bear on the independence and good faith of a committee in such a corporation. To that end, a reviewing court should consider those factors in its inquiry.

ceedings in accordance with this opinion.[12] If the judge finds (1) that the committee was independent and unbiased, and (2) that its decision (that pursuing the derivative claims against the corporate defendant would not be in the corporation's best interests) was a reasonable and principled decision, judgment shall enter for the corporate defendant. Unless the defendant sustains its burden of proof as to both of those questions, the case should proceed to trial.

*So ordered.*

---

[12]In reversing summary judgment for the corporation, we are not deciding whether the corporation's claims are barred by the statute of limitations.